UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DWIGHT BRAXTON,

                Plaintiff,

                                    CASE NO. 14-cv-12063
    v.                             HONORABLE GEORGE CARAM STEEH

UAW INTERNATIONAL, BRIAN
JOHNSON, and DAVE KEGALS,

                Defendants.

_____/

OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DOC. #18),
DENYING PLAINTIFF'S MOTION TO AMEND (DOC. #26),
AND DENYING DEFENDANTS' MOTION FOR SANCTIONS (DOC. #33)

      This is a case alleging employment discrimination.  Plaintiff Dwight Braxton

("plaintiff" or "Braxton"),[1] an African-American, is employed at the MGM Grand Detroit

casino ("MGM").  Braxton is a member of the defendant International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America (UAW) (the

"International Union").  The International Union is a member of the Detroit Casino Council

(the "DCC"), a consortium of four unions that represent different sectors of the workforce

at three casinos in Detroit in collective bargaining negotiations, of which MGM is a member.

Braxton is also a member and holds an elected position with the International Union's

affiliated local union, the UAW Local 7777.

_____

    [1] The complaint shows plaintiff's name as Dwight.  However, the pleadings
sometimes reference plaintiff as "Dewight," and, at plaintiff's deposition, he referred to
himself as Dewight.  (Pl's. Dep. 7:1–4).

Braxton filed this employment discrimination lawsuit against the International Union and defendants Brian Johnson ("Johnson") and Dave Kegals ("Kegals"), representatives of the International Union. Braxton alleges that he was "acting as an employee/member/representative" of the International Union, and that the International Union discriminated against him because of his race, in violation of Title VII of the Civil Rights Act of 1964 and the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2201, *et seq.* The complaint was filed in state court and removed to this court by defendants on federal jurisdiction grounds. *See* 28 U.S.C. § 1331.

Now before the court are the following motions:

(1) defendants' motion for summary judgement (Doc. #18);

(2) plaintiff's motion to amend the complaint (Doc. #26); and

(3) defendants' motion for Rule 11 sanctions (Doc. #33).

The court held a hearing on the motions on December 17, 2015. At the conclusion of the hearing, all motions were taken under advisement. For the reasons that follow, defendants' motion for summary judgment will be granted, plaintiff's motion to amend will be denied, and defendants' motion for Rule 11 sanctions will be denied.

## I. BACKGROUND

### A. Plaintiff's Employment With MGM

Plaintiff began his employment with MGM on July 6, 1999. (Pl's. Dep. 7:14–15). He was hired as a dealer for table games. (*Id.* at 7: 16–17). As best as can be gleaned from the record, plaintiff currently holds this position, but has been out on medical leave since December 10, 2014. (*Id.* at 7:11–13, 7:16–20, 223:14–15).

### B. Plaintiff's Membership With The International And Local Unions

When plaintiff was hired by MGM in 1999, he was not part of a union. (*Id.* at 8:1–3). Sometime in 2001, however, plaintiff became involved with the International Union and its local counterpart, the UAW Local 7777. (*Id.* at 8:4–9). Plaintiff has been a member of the International and local unions since 2001. Moreover, since 2003, plaintiff has been a "bargaining member at large" for UAW Local 7777, an elected position. (*Id.* 8:15–9:2). The "UAW Local 7777 represents approximately 700 MGM bargaining unit employees working at table games, slot machines, cash registers and VIP rooms at the employer's Detroit casino." (Johnson Aff. ¶ 4).

Plaintiff spent approximately four hours per week fulfilling his duties as a bargaining member at large for UAW Local 7777. (Pl's. Dep. 10:3–5). He received the same hourly wage as a bargaining member at large as he received from MGM for his day-to-day employment. (*Id.* at 10:8–10). The UAW Local 7777 paid plaintiff for his union work. (*Id.* 10:11–12).

The International Union is governed by an executive board comprised of officers and directors elected at the International Union's quadrennial convention. (Isaacson Aff. ¶ 4). Specifically, the executive board of the International Union is comprised of a president, secretary/treasurer, three vice presidents and nine regional directors. (*Id.*). International Union representatives are assigned to work with local unions, such as UAW Local 7777. (*Id.* ¶ 6). However, these representatives "have no authority to direct a [l]ocal [u]nion with regard to matters of staffing, hours, or pay for [l]ocal [u]nion officers or representatives." (*Id.*). In other words, local unions are "autonomous entities from the International." (*Id.* ¶ 7).

C. The International Union Defendants

-3-

Plaintiff filed this action alleging race discrimination and a hostile work environment by the International Union through two of its representatives.   The representative defendants who dealt with plaintiff are:

### 1. Brian Johnson

Brian Johnson ("Johnson") is an International Union representative and has served in this capacity since February 2000.  (Johnson Aff. ¶ 1).  In May 2012, Johnson was assigned to represent employees in the gaming industry in Detroit, including the employees at MGM, as a "UAW Region 1" representative.  (*Id.* ¶ 3, 6).  UAW Region 1 is part of the International Union, covering the region encompassing MGM's Detroit casino.  In his role as an International Union representative, part of Johnson's duties include "handling grievances brought on behalf of unit employees."  (*Id.* ¶ 5).

### 2. Dave Kegals

Dave Kegals ("Kegals") is the Director of the Gaming Department at the International Union.  (Kegals Aff ¶ 1).  He has held this position since 2014.  (*Id.*).  Prior to that, from 2010 until 2014, Kegals served as the administrative assistant to International Union Vice President Joe Ashton.  (*Id.*).

In his role as Director of the Gaming Department, Kegals negotiates collective bargaining agreements on behalf of the International Union with casinos throughout the country, including MGM.  (*Id.* ¶ 3).  Recently, beginning in August 2011, Kegals was the lead negotiator on behalf of the International Union over a successive collective bargaining agreement between DCC and MGM.  (*Id.* ¶ 5).  In this capacity, Kagels worked with UAW Local 7777's bargaining committee, including the plaintiff.  (*Id.*).

### D. The Collective Bargaining Agreement Grievance Process

-4-

Article 23 of the collective bargaining agreement ("CBA") between the DCC and MGM, at all times relevant to this action, contained a four-step grievance procedure. (McIntosh Aff. ¶ 4). The grievance process begins with UAW Local 7777 representatives initiating a grievance with MGM. (Johnson Aff. ¶ 6). The UAW Local 7777 processes grievances internally through the first three steps of the grievance process, and, if a grievance is unresolved past step three, the grievance is referred to UAW Region 1 at the International Union level for resolution. (*Id.*).

Grievances are reviewed once a week. (Pl's. Dep. 77:4–6). If a grievance is referred to UAW Region 1, the UAW Region 1 representative has three options: (1) settle the grievance, (2) advance the grievance, or (3) withdraw the grievance. (Johnson Aff. ¶ 6). If a grievance is advanced, a "step 3.5 meeting" is scheduled by the UAW Region 1 representative to discuss the merits of the grievance with MGM. (*Id.*). Conversely, if a grievance is withdrawn, it is no longer pursued by the International Union. The final step, step 4, is arbitration pursued on behalf of the grievant by the International Union. (*Id.*).

E. The Alleged Discrimination

Plaintiff contends that defendants discriminated against him because of his race and created a hostile work environment. The court discusses the record evidence below, concentrating on the evidence plaintiff relies on to argue racial discrimination and a hostile work environment.

1. Local Union's Role During Collective Bargaining Negotiations

In August 2011, the DCC began negotiations with MGM over a successor CBA. (Kegals Aff ¶ 5). The negotiations involved 40 people participating on behalf of the

-5-

International Union, including UAW Local 7777's bargaining committee, of which plaintiff is a member, and 100 people on the DCC side. (*Id.*). After approximately three months of negotiating without reaching an agreement, the DCC decided meditation would be the best strategy towards reaching a deal, and MGM agreed to mediate. (*Id.* ¶ 6). During the mediation, the mediator recommended that the parties reduce the number of representatives from both sides to provide for a more efficient and effective mediation process. (*Id.* ¶ 7). This meant that there would only be two representatives on the union side. Kegals decided that those two representatives should be him and plaintiff. (*Id.*).

Kegals says that he asked plaintiff to participate in the mediation with him as a union representative; however, plaintiff refused to participate in the mediation unless the entire UAW Local 7777 bargaining unit was also able to participate. (*Id.* ¶ 7). Plaintiff alleges, somewhat conclusory, that Kegals's refusal to allow the entire UAW Local 7777 bargaining unit to participate in negotiations was somehow discriminatory.

Plaintiff also claims that he suffered race discrimination during the negotiations. (Pl's. Resp. Br. at 4, Doc. #28 at 11). *See also* (Compl. ¶ 13). Plaintiff says that, during the negotiations, Kegals made racial comments to him, such as calling him a "big black bodyguard." (Doc. #28 at 11; Compl. ¶¶ 13–15). However, plaintiff's coworker, Tina Phillips ("Phillips"), testified that these comments occurred at a different time and in a different context, as will be explained below.[2]

---

[2] Tina Phillips is an African-American and the UAW Local 7777 chairperson. Phillips also has a pending lawsuit against the International Union, Johnson, and Kegals, among others, alleging racial discrimination. *See Tanganeka L. Phillips v. UAW International, et al*, No. 15-cv-10525 (Lawson, J.). In addition, there is another pending lawsuit against the International Union alleging racial discrimination. *See Victor Swanson v. UAW International*, No. 14-cv-12581 (Cleland, J.).

-6-

### 2. Withdrawal of Grievances Based on Race

Plaintiff contends that Johnson withdrew, rather than advance, grievances that were referred from the UAW Local 7777 to the International Union on the basis of race. In other words, plaintiff states that Johnson withdrew grievances filed by African-American grievants, solely on the basis of their race.

In support of his position, plaintiff cites to a meeting that allegedly occurred where Johnson, in front of other representatives, placed grievances in two different piles based on the grievant's race, and then withdrew all the grievances of African-Americans. But plaintiff was not at this meeting; he allegedly heard about it from a coworker. On April 18, 2013, a Step 3.5 meeting took place at MGM to discuss a number of grievances filed with the UAW Local 7777 and referred to the International Union for resolution. (McIntosh Aff. ¶ 5). Present at this meeting were MGM's Director of Human Resources Tara McIntosh ("McIntosh"), Johnson, Phillips and MGM employee Scott Huller ("Huller"). (*Id.*). Plaintiff contends that his coworker Phillips approached him after the meeting and told him that Johnson had withdrawn all referred grievances filed by African-Americans. (Pl's. Dep. 105:13–15).

The testimony about this meeting is conflicting. Phillips contends that there was a meeting between her, Johnson and plaintiff prior to the meeting at MGM. Phillips's affidavit contends that the meeting occurred in May 2013, not on April 18. (Phillips Aff. ¶ 18). At the meeting, Phillips says that Johnson asked her and plaintiff the race of each grievant and "separated the grievances into two piles, one for minorities and one for non-minorities." (*Id.*). Then, "[a]t the end of the meeting Mr. Johnson withdrew all the grievances of the

-7-

minorities based upon their race." (*Id.* ¶ 19).  At her deposition, Phillips elaborated on plaintiff's role at the meeting:

> He [Johnson] had – he came in with a stack of grievances, I was sitting at my desk, Braxton [plaintiff] was sitting at a side desk of his and [Johnson] sat down across from him and he pulled out a stack of grievances, sat them on the desk and he said – I remember Christopher Mosley was one and he said what's his race and I turned to look at him and I said what does that got to do with the grievance.  And he said would you just answer the damn question, 'cause he always cursed.  And I said he's black and then he flipped it over.  And then he said another name and I said I don't understand what this has to do with the grievance.  And he, once again, said would you just answer the fucking question, Tina, I'm handling this.  So I refused to tell him anymore, so Braxton continued to tell him the race and he was separating them as he was telling the race or as Braxton was telling him the race.

(Phillips Dep. 74:21–75:12).

As explained above, plaintiff stated that Phillips told him about the separation of grievances based on race after it occurred.  He never testified that he attended any meeting or witnessed firsthand that grievances were withdrawn on the basis of race.

McIntosh states that of the eleven employee grievance files reviewed on April 18, none of them were "bundled or organized in any particular manner"; specifically, they were not organized into two piles based on the race of the grievant.  (McIntosh Aff. ¶ 8).  McIntosh contends that each grievance file was discussed on the merits on an individual basis, and, only two of the eleven grievances were withdrawn by Johnson: Christopher Mosely's (an African-American) and Karen Cantinella's (a Caucasian).  (*Id.* ¶ 10).  In addition, the meeting resolved the grievance related to Angela Knopek.  (*Id.* ¶ 11).  This left eight grievances unresolved.  (*Id.* ¶ 12).  These remaining grievances were eventually denied by MGM but never withdrawn by the International Union, either through Johnson or anyone else.  (*Id.* at 13–14).

-8-

### 3. Preferential Treatment During Investigation

Plaintiff also testified that he was treated differently than Caucasian coworkers during an internal investigation related to allegations made against plaintiff that he had discriminated against the Caucasian coworkers.

On June 28, 2013, two Caucasian members of UAW Local 7777, Jeff Weisner ("Weisner") and Corinne Franks ("Franks"), filed an internal complaint against plaintiff alleging racial discrimination. Specifically, Weisner and Franks alleged that plaintiff used offensive and derogatory language during a run-off election at UAW Local 7777. (Gee Nov. 5, 2013 Letter). Weisner and Franks stated that plaintiff, among other things, used a loudspeaker to announce: "I don't know why you all are voting for the white folks, you all need to vote the right folks; you all know they are killing us. Don't you remember 300 years ago, the white man kept us down and they are still keeping us down today." (Dec. 3, 2013 Investigator Buchner Letter). In addition, it was alleged that plaintiff disclosed personal details about grievances he had reviewed.

An investigation was initiated by Ying Gee ("Gee"), the Director of the International Union's Human Rights Department. Plaintiff says Gee treated him differently than she treated Weisner and Franks. Specifically, plaintiff contends that he was not allowed to bring a representative, Venus Jeter, with him to a meeting with Gee and Johnson, while Weisner and Franks were allegedly permitted to bring representatives with them. (Pl's. Dep. 45:10–25, 47:2–48:13). Plaintiff testified that Johnson and Gee told him he could not bring any representatives with him. (*Id.* at 46:24–47:1).

Gee states that she interviewed plaintiff, Franks and Weisner individually, and that none of them were permitted to bring a representative or witness with them to the interview.

(Gee Aff. ¶ 7).  During her interview with plaintiff, Gee says that plaintiff admitted the majority of the derogatory statements he was charged with making, including the statement using the loudspeaker, as described above.  (*Id.* ¶ 8).

While the investigation was ongoing, plaintiff filed his own internal complaint against Franks and another employee, Beth Fox ("Fox").  Plaintiff's complaint stated, "I am filing a complaint against Corine Frank Beth Fox False Statement Slander Racial Remarks Harassment."  (Pl's. Compl. Against Franks).  Gee found the complaint to be conclusory and made in retaliation to the original complaint against plaintiff.  (Gee Aff. ¶ 10).

Gee's investigation of the original complaint against plaintiff concluded that plaintiff did not violate any civil rights statutes or the International Union's "No Discrimination" Policy.  (*Id.* ¶ 11).  However, Gee recommended that plaintiff be admonished not to use such categories of identification, that the UAW Local 7777 provide training to their stewards about maintaining confidentiality about members' grievances, and that the UAW Local 7777 receive diversity training.  (*Id.*).  None of Gee's recommendations were implemented.  (*Id.* ¶ 12).

### 4. Cutting Hours of UAW 7777's Bargaining Members

Around September 2013, plaintiff contends that the International Union cut in half the hours he was permitted to work as a bargaining member at large for UAW 7777.  According to plaintiff, this required him to conduct union work on his own time without getting paid.  (Pl's. Dep. 107:8–22).  Plaintiff contends that this was done because of his race.  Plaintiff concedes that UAW 7777, not the International Union, paid plaintiff for his

time spent as a bargaining member at large, and that it was ultimately the UAW 7777 board as a whole that voted to cut the hours its members spent on union work in order to save money.  (*Id.* 107:10–13).  At oral argument, however, counsel for plaintiff argued that the UAW 7777 board was under duress from the International Union when it voted to cut its members' hours.

International Union representative Anthony Feyers's affidavit says that, in September 2013, Feyers was approached by then-UAW Local 7777 President Venus Jeter ("Jeter") for advice on how to solve UAW Local 7777's ongoing financial problems.  (Jeter Aff. ¶ 3).  Feyers made several suggestions to Jeter, one recommendation being cutting the number of hours or days that executive board members and representatives receive pay for union business.  (*Id.* ¶ 4).  Jeter sought to implement some of Feyers's suggestions.  Specifically as it relates to cutting the hours of representatives, Jeter took the issue to UAW Local 7777's executive board, including plaintiff, for a vote.  (*Id.* ¶ 6).  The executive board voted to cut the hours.  (*Id.*).  Feyers was not involved in the vote, is not a member of UAW Local 7777's executive board, nor does he have any say in the UAW Local 7777's actions.  (*Id.* ¶¶ 5, 7).  The International Union only made the recommendation; it was the UAW Local 7777 who voted — and agreed — to cut the hours.

F. Jeter's Communications With International Union

In 2013, Jeter communicated with the International Union voicing concerns about problems that the UAW Local 7777 was having with Johnson.  On April 4, 2013, Jeter sent a letter to Charles Hall ("Hall"), Director of UAW Region 1.  (Doc. #28-6).  Jeter informed Hall that Johnson was disrespecting members.  (*Id.* at 3).  On May 18, 2013, Jeter sent a memo to Bob King ("King"), the International Union's President.  (Doc. #28-7).  Jeter

alleged mistreatment by Johnson and Kagel during collective bargaining negotiations and other meetings with UAW Local 7777 personnel.  (*Id.*).

Hall responded to Jeter in a letter dated February 17, 2014 and informed Jeter that he spoke with Johnson about the complaints.  (Doc. #28-9).   A couple months later, on April 11, 2014, Jeter wrote a letter to King asking that Johnson be removed as the regional representative for UAW Local 7777.  (Doc. #28-10).

G. Stray Racial Comments And Actions

At his deposition, plaintiff testified that Johnson made racially derogatory comments to him, but he could not recall when some of the comments occurred.  On one occasion, Johnson told plaintiff that the union would run better if there were not so many African-Americans on the executive board.  (Pl's. Dep. 77:25–78:5, 80:1–5).   Phillips's affidavit contends that this comment occurred in November 2013.  (Phillips Aff. ¶ 20).

Phillips also testified about Johnson's derogatory comments.  In approximately May 2012, Phillips claims that Johnson referred to plaintiff as Phillips's "big, black guy, [her] bodyguard."  (Phillips Dep. 133:1–7).  Phillips says that Johnson was cursing at her during a meeting where grievances were being discussed, and, when plaintiff tried to intervene on her behalf by telling Johnson, "that's enough," Johnson responded to plaintiff, "what, oh, because you're big and black.  You're her bodyguard, I'm supposed to be afraid of you." (*Id.* at 133:14–21).   Phillips contends that Johnson "would scream and yell at African Americans calling [them] incompetent and being overly critical of [their] work due to [their] race."  (Phillips Aff. ¶ 5).

-12-

Phillips also testified that Johnson discriminated against other employees because of their race.  Phillips stated that she once tried to set up a grievance meeting to discuss grievances filed by MGM slot technicians.  (Phillips Dep. 135:11–20).  However, Johnson only set up the meeting when Kiera Teall ("Teall"), a Caucasian employee, requested the meeting.  (*Id.* at 136:14–16).  Phillips attended the meeting, but says that she was invited by Teall, not by Johnson.  (*Id.* at 136:17–20).  Phillips contends this was discriminatory on Johnson's part.

In addition to racial comments made by Johnson, Phillips recalled similar comments made by Kagels.  At her deposition, Phillips stated that during one meeting, Kagels started naming representatives that he would fire if he had the authority; all of the representatives were African-American.  (*Id.* at 189:17–23).  Moreover, Phillips contends that Kagels told her that all of the Caucasian representatives hated the African-American representatives.  (*Id.* at 190:2–5).  Phillips also testified that Kagels "called us [the UAW Local 7777 e-board] incompetent, we were incompetent people.  He said we make too much money, we make more than the auto and they really work."  (*Id.* at 191:6–10).

G. Plaintiff's EEOC Charge

On November 19, 2013, plaintiff filed a charge of discrimination against the International Union with the EEOC.  Plaintiff checked the box showing that he was being discriminated based on "race" and he alleged:

> I began working for this union in 2001.  I am currently employed as an at large Bargaining Unit Member.

-13-

> In June 2013, a complaint was made against me by a white member. This complaint alleged I was a racist. I filed a counter charge, alleging racism on her part. An investigation was done. During the investigation, I was not allowed to bring a representative or witness with me, but the white female was allowed a representative. Now, months later, I have not received any response. In addition, I am aware that the Regional Representative withdrew all grievances filed by black members.
>
> I believe I have been discriminated against by being denied equal representation based on my race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe that blacks as a group are discriminated against.

(Doc. #18-15). He also checked the box "continuing action," listing the earliest discrimination taking place on June 10, 2013, and the latest action taking place on the date of the EEOC filing. (*Id.*).

Gee prepared a response to plaintiff's charge and submitted the response to the EEOC. (Gee Aff. ¶ 14). The EEOC dismissed the charge on January 28, 2014. This timely lawsuit followed.

## II. LEGAL STANDARDS

A. Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distrib. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence from which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

B. Amendment

Rule 15(a)(2) of the Federal Rules of Civil Procedure allows a party to amend its complaint after a responsive pleading has been filed, with written consent of the opposing party or the court's leave. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has explained that courts may deny leave to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and/or] futility of amendment." *Forman v. Davis*, 371 U.S. 178, 182 (1962).

C. Rule 11 Sanctions

Rule 11 requires factual contentions in pleadings, including motions, to "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). Where an alleged violation of Rule 11 has occurred, the party seeking sanctions must separately file a motion describing the "specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. (c)(2).

III. DISCUSSION

A. Defendants' Motion for Summary Judgment

1. The Title VII Claim

i. The Individual Defendants — Johnson and Kagels

-16-

As a preliminary matter, plaintiff conceded at oral argument that his Title VII hostile work environment claim cannot proceed against the individual defendants. The court agrees. *Sam Han v. University of Dayton*, 541 F. App'x 622, 629 (6th Cir. 2013) ("Title VII does not allow for liability on the part of any person or entity other than Plaintiff's 'employer.' And according to this Court, under 42 U.S.C. 2000e, an 'employer' does not include the 'supervisors,' 'managers,' or 'co-workers' of a plaintiff.") (citation omitted). Therefore, this claim is dismissed against Johnson and Kagels.

### ii. Disparate Treatment

To the extent that plaintiff is bringing a disparate treatment race discrimination claim, defendant argues that plaintiff has not established that defendant subjected plaintiff to any adverse action. Plaintiff did not respond to this argument in the briefing or at oral argument. Plaintiff devotes his entire argument to a hostile work environment claim. Because plaintiff failed to meet his burden in opposing summary judgment on this claim, any disparate treatment claim will be dismissed.

Aside from the fact that plaintiff does not oppose summary judgment on any purported disparate treatment claim, the court agrees with defendant that plaintiff has not established that he suffered an adverse employment action because of defendant. To succeed on a disparate treatment race discrimination claim under Title VII, the plaintiff must establish that he suffered from an adverse employment action. "An adverse employment action in the context of a Title VII discrimination claim is a 'materially adverse change in the terms or conditions of employment because of the employer's actions.'" *Michael v. Caterpillar Financial Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (citation omitted). The Sixth Circuit has explained that, "[m]aterially adverse changes in the terms and conditions

-17-

of employment include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 625 (6th cir. 2013) (citation omitted).

Here, the only potentially adverse action plaintiff suffered is a reduction of his paid hours for conducting local union work. However, the undisputed evidence shows that this was not a reduction of hours caused by defendant. Rather, as explained above, the UAW Local 7777, of which plaintiff is a member, voted to reduce paid hours for conducting union work as a means of addressing financial concerns. Although plaintiff argues that the UAW Local 7777 was under duress from the International Union when it voted to cut its members' hours, he has not proffered any evidence establishing a genuine issue of material fact on this point. Plaintiff submitted a second affidavit from Jeter explaining that "Mr. Feyers instructed the board to make the cuts with threats of the Local Union being placed into receivership." (Jeter's Second Aff. ¶ 5).[3] This falls far short of plaintiff's burden in establishing a genuine issue of material fact that *each voting board member* of the UAW Local 7777 was under duress when it voted to reduce the hours. Accordingly, defendant is entitled to summary judgment to the extent that plaintiff is asserting a disparate treatment claim.

iii. Hostile Work Environment

---

[3] At oral argument, defendants asked the court to strike Jeter's second affidavit because it was filed in response to defendants' motion for Rule 11 sanctions, not in response to defendants' motion for summary judgment. Because the affidavit does not affect the outcome, the court sees no reason to strike it.

Next, defendant argues that the court should grant summary judgment on plaintiff's hostile work environment claim for three reasons: (1) plaintiff did not raise a hostile work environment claim with the EEOC, and, thus, the court lacks subject-matter jurisdiction; (2) the International Union is not plaintiff's employer, and, therefore, cannot be liable for creating a hostile work environment; and (3) plaintiff's hostile work environment claim fails on the merits.  The court addresses these arguments in turn.

*The allegedly deficient EEOC charge.*  First, defendant argues that plaintiff did not exhaust his administrative remedies by alleging a hostile work environment claim in his EEOC charge.  The court disagrees.

Defendant contends that the scope of plaintiff's EEOC charge "was limited to: (1) alleged disparate treatment by the [defendant] in its handling of the June 2013 complaint of race discrimination against him; and (2) a general awareness that Johnson allegedly withdrew grievances filed by black members."  (Defs.' Br. in Support of Mot. for Summ. J. at 22, Doc. #18 at 32).  Defendant argues that plaintiff's hostile work environment claim "dramatically expands the scope of his EEOC charge. . . ." (*Id.*).  However, the court must bear in mind that pro se EEOC charges are to be construed liberally. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010).  When construing plaintiff's EEOC charge liberally, it is reasonable to infer that he alleged a hostile work environment claim.  In addition to listing two specific actions by defendant, plaintiff checked the box "race," as well as the box indicating that it was a "continuing action."  Moreover, plaintiff explicitly stated in the EEOC charge that he believed "that blacks as a group are discriminated against." Liberally construing the EEOC charge, it can reasonably be read as alleging an ongoing hostile work environment claim.  The court has subject-matter jurisdiction to proceed.

*The alleged employment relationship between the International Union and plaintiff.*
Second, defendant argues that it cannot be liable for a hostile work environment claim because it is not, and was never, defendant's "employer." Plaintiff responds that defendant was his employer because defendant controlled the manner and means by which plaintiff accomplished his job duties. In addition, plaintiff argues that he does not need to establish an employment relationship with the International Union because Title VII should be broadly construed to allow hostile work environment claims brought against unions. Defendant has the better argument.

Plaintiff's novel argument that defendant was his "employer" as defined in Title VII, and, therefore, may be liable for a hostile work environment claim, has never been adopted by any court. Indeed, "[c]ourts do not impose liability on labor organizations for hostile work environment claims because hostile work environment claims emerge from the language of 42 U.S.C. 2000e-2(a)(1) specifically attaching liability to employers' discriminatory actions." *Hout v. City of Mansfield*, 550 F.Supp.2d 701, 742 (N.D. Ohio 2008) (citing *Kasper v. City of Middletown*, 352 F.Supp.2d 216, 233 (D.Conn. 2005)). Here, MGM was plaintiff's employer, not the International Union. The International Union cannot be liable for a hostile work environment claim on the theory that the defendant was, for all purposes, plaintiff's employer.

That is not to say that a union can never be liable for a hostile work environment claim. A union may be liable for a hostile work environment if the plaintiff could show (1) he was subjected to a hostile work environment by his employer (here MGM); (2) he requested the union take action; and (3) the union ignored his request for action. *See, e.g.*, *Slater v. Susquehanna Cnty.*, 613 F.Supp.2d 653, 664 (M.D. Pa. 2009). Moreover, a union

-20-

may be liable under Title VII if the union causes or attempts to cause an employer to discriminate, or if it prevents an employer from fulfilling its statutory responsibilities. *Carter v. Chrysler Corp.*, 173 F.3d 693, 703 (8th Cir. 1999).  In other words, a union may only be liable if it instigates an employer's discrimination or actively supports the employer's discriminatory acts.  *Eliserio v. United Steelworkers of America Local 310*, 398 F.3d 1071, 1076–77 (8th Cir. 2005).  That is not what is alleged here, nor was it established by the record evidence.

*The merits.*  Finally, even if plaintiff had a viable theory that defendant was his employer, or that he need not establish an employment relationship, he has not established a genuine issue of material fact that defendant subjected him to a hostile work environment.  To establish a *prima facie* hostile work environment case, plaintiff must demonstrate that '"(1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's protected status; (4) the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective or preventative actions.'" *Mensah v. Mich. Dep't of Corrections*, — F. App'x —, 2015 WL 4665430, at *3 (6th Cir. Aug. 7, 2015) (citing *Fullen v. City of Columbus*, 514 F. App'x 601, 606–07 (6th Cir. 2013)).  The conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "Factors to be considered include 'the frequency of the discriminatory conduct; its severity; whether it is physically

-21-

threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance.'" *Id.* (citation omitted).

Here, plaintiff has not created a genuine issue of material fact that the environment created by defendant was severe and pervasive. Assuming all the facts presented by plaintiff to be true, even the facts contradicted by the record evidence, and ignoring all evidentiary problems plaintiff faces, the evidence is insufficient to rise to the level of a severe and pervasive hostile work environment. The evidence, viewed in a light most favorably to plaintiff, establishes:

- plaintiff was referred to as a "big black bodyguard" either during a grievance review meeting or during 2011 CBA negotiations

- on one occasion, defendant was either told or witnessed grievances of African-American individuals being withdrawn based on the grievant's race

- plaintiff was treated differently during an investigation against him by two Caucasian coworkers, in that the Caucasian coworkers were permitted to bring a representative with them to an investigatory meeting but plaintiff was not permitted to do the same

- plaintiff's union hours, and all local representatives' hours, were cut in half

- on one occasion, Johnson told plaintiff that the UAW Local 7777 would be run better with fewer African-Americans on the board

- During a meeting, Kagels named all of the African-American UAW Local 7777 representatives and stated that he would fire them if he had the authority

Assuming that all of the above occurred, it does not amount to the level of a severe and pervasive work environment. Importantly, plaintiff conceded at his deposition that his union work was limited to once a week, for a few hours. Thus, the above instances that occurred over a period of over three years occurred sporadically during plaintiff's tenure as a UAW Local 7777 representative. At oral argument, plaintiff's counsel argued that the

racial animosity was severe and pervasive and occurring on a daily basis. Plaintiff's counsel did not point to any record evidence in support of that statement, and that statement cannot be reconciled with plaintiff's testimony that he only worked as a bargaining member at large for a few hours on Friday of each week.

Thus, any racial comments and actions plaintiff suffered were isolated incidents that did not affect the terms and conditions of his employment or his ability to conduct his job at MGM on a daily basis. The comments and actions, described above, were not inherently severe.

Sixth Circuit case law sets a high standard for establishing a severe and pervasive work environment, and plaintiff has not met that standard. *See, e.g.*, *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707–708 (6th Cir. 2007) (fifteen specific incidents involving racial comments spanning a two-year period were isolated and not pervasive; they were "mere offensive utterances" not actionable under Title VII); *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 513 (6th Cir. 2011) (racial comments were not severe or pervasive when all but two occurred over a two-day period, and statements that black people should "go back to where they came from" and were "monkeys" were "mere offensive utterances" rather than conduct that is "physically threatening or humiliating."); *Russell v. University of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008) (isolated comments made two years prior to plaintiff's termination were not pervasive or severe to amount to discriminatory changes in the terms or conditions of employment); *Ejikeme v. Violet*, 307 F. App'x 944, 949 (6th Cir. 2009) (plaintiff being called a "monkey" and "horse" fell short of creating an objectively hostile work environment for purposes of Title VII). Here, when looking at the aggregate of the comments and acts that occurred during plaintiff's tenure as UAW Local 7777

-23-

representative, plaintiff has not established a hostile work environment. Thus, defendant is entitled to summary judgment on the hostile work environment claim.

### 2. The ELCRA Claim

As it relates to the ELCRA hostile work environment claim, a plaintiff is required to prove the same elements required to prevail under Title VII. *Haynie v. State*, 664 N.W.2d 129 (Mich. 2003). Having determined that defendants are entitled to summary judgment on the Title VII claim, they are also entitled to summary judgment on the ELCRA claim.

### B. Plaintiff's Motion To Amend

Plaintiff also filed a motion to amend the complaint. Plaintiff argues that, to the extent the court determines that the International Union was not plaintiff's "employer" for Title VII purpose, plaintiff seeks to assert claims of tortious interference with a business relationship, intentional infliction of emotional distress and negligence under Michigan law. Plaintiff is not entitled to amendment.

First, in addition to determining that the International Union is not plaintiff's employer, the court determined that plaintiff's Title VII claim fails on the merits. Plaintiff only sought to amend if the court did not address the merits of his claim.

Second, the court in this opinion dismisses the federal claims which formed the basis of this court's subject-matter jurisdiction. Thus, the court would decline exercising jurisdiction over plaintiff's proposed amended complaint asserting only state law claims. 28 U.S.C. § 1367 (explaining that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.").

### C. Defendants' Motion For Sanctions

-24-

Finally, defendants filed a motion for Rule 11 sanctions.  Defendants argue that plaintiff made multiple unsupported factual assertions in response to defendants' motion for summary judgment.  Specifically, defendants contend that plaintiff did not have support for his contentions that (1) he had an employment relationship with the International Union; (2) the International Union was responsible for reducing the number of hours plaintiff could spend conducting union work; (3) Franks was permitted to bring a representative with her during the internal investigation against plaintiff; and (4) grievances were separated on the basis of race.

Although defendants characterize the argument in plaintiff's opposition brief as "unsupported factual contentions," it is more properly viewed as legal argument.  Such advocacy, although short of surviving summary judgment, does not warrant Rule 11 sanctions.  Rule 11 sanctions will not be imposed.


IV. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is GRANTED, plaintiff's motion to amend is DENIED, and defendants' motion for Rule 11 sanctions is DENIED.  This case is DISMISSED.

IT IS SO ORDERED.


Dated:  January 4, 2016

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
January 4, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk